Thank you, Ms. Younger. Our first case this morning is number 21-3093, United States against Guyton. Ms. Horne. As you know, we allotted extra time for this case. There's a lot going on here, but you're not required to use all of it. I wanted to make sure we had enough time. Thank you. Good morning. My name is Abigail Horne. I represent the appellant, Lynell Guyton. May I please reserve six minutes for rebuttal? Granted. This appeal involves a conglomerate jury trial at which multiple errors arose. In particular, the district court gave an erroneous jury instruction on the knowledge element for a prosecution under the Analog Act in violation of the Supreme Court's 2015 decision in McFadden. As a result, this court should remand for a new trial at which the district court should correct the other three errors. We are on plain error review of the district court's jury instruction, right? Yes. And we have to read the instructions as a whole. You suggest that it wasn't clear that the jury knew that it had to find that this was a federal controlled substance. But the court referred to controlled substance, and elsewhere it talked about Schedule II just a few pages before that in the instructions. Don't we put all that together and say collectively it was clear to the jury, or at least it wasn't plainly erroneous, that this had to be a federally controlled substance? Well, I disagree with that characterization of the argument, Judge Bibas. I think that the issue isn't whether the jury found that this was a federal controlled substance. There was a stipulation to what the substance was. But that he had to know that it was a federally controlled substance. Exactly. He had to know. And what we have on this record is a real distinction based on the unusual trial evidence, which created a legitimate defense that Mr. Guyton knew that this was controlled under Pennsylvania law. What we have in the record here are three lab reports, each of which say controlled under Pennsylvania law.  We've got the lab reports talking about the state, but the instructions nowhere are talking about state throughout. It's about federal substances. So when you refer to this Appendix 597, we have to read it in light of what came at 591, 592, 593 a few pages earlier. The discussion is all about Schedule II and federal substances. I think what the issue here is, you know, anytime we have a jury instruction issue, the questions from the government is going to be charged as a whole. But what we have here is controlled substance is not a federal term. It's a federal and a Pennsylvania term. This controlled substance was defined by the district court to the jury as some kind of prohibited drug. That's Appendix 596. And we don't have a cross reference. The government stresses the definition of analog of fentanyl. But that phrase, analog of fentanyl, does not appear in the knowledge instruction, which had the McFadden errors. They don't cross reference one another. In the knowledge instruction... But we have explicit reference of Title 21 of the United States Code and a violation of federal law. I don't know how much clearer you can get. I mean, granted, that's three, four pages earlier in the record, but that's the only discussion of law that's there. And it's just a few pages before. Yeah, I'm just simply going to have to disagree, Judge Bevis, because what the district court told the jury is that Mr. Guyton need not know his acts amounted to a crime. That's the error. We agree. We know it's an error. But you have to satisfy plain error. Right. And the way we satisfy plain error is because of the trial record in this case. I mentioned the lab reports. I also want to mention the government's expert, Ms. Wilkinson, who said repeatedly this was a controlled substance under Pennsylvania law. These aren't normal substances. This is meth oxyacetyl fentanyl, cyclopropyl fentanyl. And the jury heard these are controlled under Pennsylvania law. The jury heard Schedule 1 refers to Pennsylvania law. And Agent Tetrault said the same thing. The government's agent said it was scheduled in Pennsylvania at the time. It was smuggled into the U.S. contrary to Pennsylvania law. And when Agent Tetrault was asked, well, what about federal law, she said, well, I'm not sure. I'm not an attorney. And so on this unusual record, the distinction between Pennsylvania and federal law was before the jury. This was a legitimate defense under McFadden, which said it can't be some law. It can't be any law. It can't be state law. It has to be federal law. The aspect of the dispute seems to bear on prong three about whether it's prudential and maybe on prong four. But my question is about prong two. If there are these phrases earlier, maybe it's sloppy. Maybe it should be better. Maybe the district court should have been more careful. But what makes it obvious that the instructions just allow the jury to convict based on something other than a federal knowledge of a federal law violation? Well, I think it's obvious under McFadden. McFadden says it's not enough that the acts violated the law. It has to amount to a violation under federal drug abuse law. Now, maybe if the knowledge instruction had said he had to know it was an analog offense, and that's already been described. But it didn't say that. It refers to a controlled substance. And the definition of controlled substance was some kind of prohibited drug, not a reference to federal law. And I should say also, our position here is fairly moderate. What we're saying is that Mr. Guyton needed to know that this was controlled under federal drug abuse laws. Is your argument the same as to the second McFadden theory? As to the second McFadden theory, the government's evidence is even weaker. Mr. Guyton is not a chemist. There's no evidence that he knew that these had similar chemical structures. I would say as to the second McFadden theory, we're asking that it not even go back before the jury because that would be a violation of double jeopardy. He has no knowledge of chemistry. So really, I think it comes down to whether there's something under the first McFadden option, whether he knew it was controlled under federal law. Let's talk about Appendix 596 where there's discussion about whether he knew in the instructions, whether he knew that what he possessed was a controlled substance. And then the court has just said it's an analog if the chemical structure is substantially similar to the chemical structure of fentanyl. What's both wrong and obviously wrong about that? Well, that part goes to Option 2, which, again, there's no evidence to support McFadden Option 2. So even if the court thinks, all right, maybe the evidence, the argument isn't as strong as the Option 2 as to McFadden Option 1, there's no evidence. There's no reason to believe that the jury found he knew that there was similar. OK, so you're not really arguing that the prong two instructions were wrong. You're arguing this is a prong one case and prong one was plainly erroneous in the instructions. I'm arguing both in the alternative. In the alternative, if the government thinks this instruction maybe was a little bit cleaner, still not right, on Option 2, there's no evidence that Mr. Guyton knew anything about chemistry. We have that in some cases. In some cases, people who produce synthetic drugs are suppliers. They're making these drugs. They know about chemistry. They're consulting the drug schedules. That's not the case here. Mr. Guyton's just a street-level dealer. There's no evidence about chemistry. What we know about chemistry came from a scientist with a master's degree. That's Ms. Wilkinson, who again said these are controlled under Pennsylvania law. So I'd like to turn to your argument about the firearms violations in Count 3. OK, and why can't a jury not infer constructive possession from the abundant evidence of Guyton's proximity to the firearms, his history of concealing contraband, his evasive conduct, and his plausible motive? Why can't the jury infer constructive possession? They cannot, Judge Fischer, because mere proximity and access is not enough. Even mere knowledge would not be enough. That's the Brown case. We have somebody who's living in a drug house with large quantities of drugs in the kitchen. She doesn't have dominion and control. And the Jenkins case, we have a gentleman who's sitting on a sofa, partially undressed. There's drugs in front of him. We know how this happened because the jury was told in the government's opening statement, the cooperating witness to feed is going to get up here. He's going to link Mr. Guyton to the abandoned house. What about the Foster case? The Foster case, this is the government's best case. We know how weak their case is. There's simply no case anywhere near this. In Foster, the defendant is a driver in a car. He gets out and flees, and there's a gun on the backseat of the car he was driving. That's nothing like this case where Mr. Guyton was never even in the derelict house. There's no evidence that he was ever in the house. It's not like he was driving a car with a gun in it. He didn't own the property, lease it. He didn't have a key. He doesn't have personal possessions inside. There's no forensics linking him to the house. This simply didn't turn out the way the government planned, and the government is now asking this court to contort constructive possession law to make up for the fact that their cooperating witness didn't testify as they expected. But wasn't there sufficient evidence for a rational jury to infer constructive possession? No, there wasn't, Judge Fischer. I'll just, maybe by example, you know, the government police officers were sweeping the area. They could have found a gun in the cemetery, in an alley, in a wheel well on the street. And by the same rationale, Mr. Guyton's a drug dealer. He has everything. Everything that's nearby is his. It conflates down to proximity, which isn't enough. The government promised they were going to connect up that evidence with a witness, and then that witness didn't deliver. So that's a huge part of your argument there, right? Yes. Can we go back for a minute to the prior issue? So let's assume it's error, the McFadden issue. Assume it's error. Assume it's plain. Why do you prevail on prong three and prong four? The reason we prevail is because the McFadden error took away the legitimate defense in this case. On this trial evidence, there was a legitimate defense that Mr. Guyton knew the substance was controlled under Pennsylvania law, as in Demut, as in Bayes. And so if you have these two things, you have the trial evidence and you have a correct McFadden extraction, then you have a legitimate defense that he knew it was controlled under Pennsylvania law, not federal law. Why couldn't his lawyer have argued? Well, he was his own lawyer, part of the problem here, but he had standby counsel, so why couldn't he or standby counsel have made that argument? I don't see the McFadden error as depriving them of the ability to stand up and say he could have stood up at closing and said, hey, I know I got this from China, but I thought it was copacetic with federal law. I thought maybe it was problematic under Pennsylvania law. That's why I was evasive, and that's why I was hiding things, and that's why I was complaining about Customs and Border Patrol tightening things down. He could have made all those arguments, couldn't he? Well, then there would have been no jury instruction to support it. What the jury heard is he need not know his acts amounted to a crime. So on the jury instructions that we have here with the McFadden error, that wouldn't have done anything. The jury was told they needed to find he knew the drug's legal status. If he had made that argument, there would not have been a jury instruction. Well, he knew the drugs were illegal. There's ample evidence in the record. The evasiveness, I'm not sure using the name Avon Barksdale helped his cause. Not a great way to hide that you're trafficking drugs. Not a chemist, like I said. Well, Avon Barksdale wasn't a chemist either. I'm joking. Yeah. Sorry. So, I mean, there's ample evidence that he knew he was trafficking illegal drugs. He was doing it from China. It was international. Why isn't there overwhelming evidence here of federal drug trafficking such that we should not invoke plea? I'd add to that. Why would he disguise it to get it to evade U.S. Customs? Well, there's cases on that. So the Demock case in the Second Circuit, the defendant was importing a synthetic MDMA analog from China. The defendant used fake shipping labels to evade customs and spoken code. And still the McFadden error was remanded for a new trial. In Bays out of the Fifth Circuit, the defendant was a supplier of a marijuana analog who knew there was no question he knew it was a controlled substance in Indiana. And the McFadden error was remanded for a new trial. Those are plain error cases? Those are harmless error cases. But we're on plain error, right? So I would say that the record here is even stronger than in those cases because all of the evidence before the jury was telling them Pennsylvania law, the government's agent, the government's expert witness, the lab reports. Mr. Guyton, I should also add, was taken to Allegheny County Jail every time he was arrested. Is your argument on Pennsylvania law helped by the fact that originally Guyton was arrested and charged in state court? Absolutely, Judge Fischer. The message that was sent to him was, you get arrested for this stuff, you're going to Allegheny County Jail, which he was repeatedly. Ms. Horne, if my colleagues want to ask more on this, I'm happy to wait. But I do want to make sure we get to the double counting and serious drug felony issue. First of all, your brief suggests we're on de novo review, but I would think we'd be on plain error review here because there was no objection or timely motion. Yes, so we agree that there's two procedural errors, if I just step back a second. Procedural errors, but let's talk about the substantive issue here. So the way that we frame the issue, Judge Bevis, is that there's two procedural errors, the lack of an 851B colloquy and the apprendi error. And that the reason why those procedural errors are prejudicial is because it's not actually a serious drug felony. OK, so you're not making an independent substantive argument here, you're talking about the prejudice from those. Right, the prejudice from those is that it's not a qualifying prior. But then we review those for plain error, correct? And then you're using this just to satisfy prong three? We can see, yes, in part, we can see that the apprendi error is on plain error. There is the D.C. Circuit opinion in Baham that says an 851B error can be reviewed de novo. So we've pitched that to the court. If it's not, we can satisfy plain error. I'm a little puzzled. We're doing this through plain error, right? There's a wrinkle and you just, you know, on what you said about the D.C. Circuit. Let's assume we are on plain error for both of these things. You're talking about the federal law of double counting. But I would be thinking I would think we would be applying Pennsylvania's law on what gets credited here. Why is why is it right to be looking at federal law about what can or can't be counted towards this sentence versus that sentence? Sure. I mean, to me, that's an easy question is because we have a text. We have the text is Section 802 of Title 21. It says for which the offender served a term of imprisonment of more than 12 months. And the court has to interpret that text and decide what is an offense for which one served a term of imprisonment of more than 12 months. Don't we just defer to the state court's own decision that he was, in fact, serving that time? You say that the text, if we squint hard enough at it, implies a requirement that the person already have been arrested for this offense. And he wasn't arrested for this offense formally until November. Right. But where does that come out of the federal text? It would seem as a matter of federalism, we would just piggyback on what the state courts say about it. So let me answer both of those questions. So we make two arguments in the alternative why it doesn't satisfy the federal definition. The first is he wasn't arrested yet. And the second is it's double counting. And why it's federal is, I mean, you can imagine the absurd results we could get to. Imagine you have a state court that says, in our state, if you conduct community, if you do community service, that's time in prison. So you did a year, we did five hours of community service a week. That counts as your imprisonment. That doesn't satisfy the federal definition. The federal definition is 802. What does it mean? And this is the same as in, you know, INA 212, which the government points out that discretionary waiver statute, which had the exact same text, serve a term of imprisonment in that case of at least five years. And it was universally found that that referred to the time actually served. And this is a reply note 10 collecting cases. It's a federal definition. The court needs to determine what the federal text means. And we also have cases already interpreting it. The Cherry case at the Second Circuit says this is the time actually served because that's a proxy for seriousness, which is what Congress intended to do in the first step back in Lee. We want to know. All right. So the state can't redefine imprisonment. The federal law requires it be actual imprisonment. And it can't redefine served either. And served. Right. But we know that he was sentenced in 2011 for the 2009 crime for a term of 18 to 36 months. That was the sentence imposed. Correct? Yes. OK. So now we have to figure out how much of that sentence did he serve. Right. And as I read the record, he served more than a year because he was given credit for time served on another crime. Isn't that what happened here? It's not, Your Honor. And the reason why is that he was given time credit. That is, it doesn't fit the federal definition. Just as much as time credit for community service wouldn't fit the federal definition. But it was time actually served in a jail. Not on this case. It wasn't the case for which he served. He was served on another case. The court's familiar with. All right. But he paid bail. And he wasn't arrested. And it was double counted. I mean, if we read if we read the law the way you suggest, we would be putting a person who didn't serve another crime, another sentence like Guyton did here, in a worse position than Guyton. You follow? You're correct that Guyton got time served on a different offense. We all agree on that. The record's clear. And you don't want us to count that time for purposes of the federal law of serving more than a year. And what I'm suggesting is that if Guyton had not committed that other crime and just served the sentence that he did in fact serve, the number of days that he served in jail on this 18 to 36 month sentence, then he would qualify under the federal statute. You want us to put him in a better position because he committed some other crime in addition and got time served on it. No, I disagree, Judge Hardiman, because what actually happened with Guyton is that he served. There were two rinky dink cases for which in either case he served less than a year of time. And what Congress wanted to do with the First Step Act is give the 851 enhancement to someone who had a serious drug felony. So one case, that's a more serious case. You can have multiple. These are little hand to hands, five packets, eight packets in county court. What's the definition of a serious drug felony? A case for which the offender served a term of imprisonment of more than 12 months. Right. So it doesn't speak to rinky dink. It doesn't speak to packages. It doesn't speak to which corner you're on. It speaks to how many months you serve in prison. And he served more than a year in prison on two different crimes, right? Right. You can't add them together. That's why it says the case for which. But they weren't consecutive. He got credit for time served. He avoided consecutive sentences. That inured to his benefit, didn't it? Now, what happened was he gets a few days, 200 days, something on one case. He gets like 200 days or something on the next case. Neither one of those is a sentence more than a year. And you can't double count it. The way time credit works. I'm sorry. Finish this answer. The way time credit works is it's like Pac-Man with the first case that comes along, eats the time credit and then it's gone. And the second case, you can't count it again. And when the state court counted it again, it was giving Mr. Guyton a pass. He wasn't sentencing him to go back to jail. That time credit had already been eaten. All right. So let's go to the procedural issues here. Let's assume we're on plain error. One of the two is an apprendi issue. But the relationship between the apprendi rule and the Almandar-Torres prior conviction exception is complicated. You can't cite anything that tells us that the serious felony length of the prior conviction has to be found by a jury rather than a judge. That makes it plain in the Supreme Court or in the Third Circuit. So how is it even plain at prong two? Oh, the fact that this is an apprendi error is plain under Erlinger because Erlinger tells us Almandar-Torres is only about what crime with what elements. It's not about the length of imprisonment. This government conceded this issue in Lee out of the Fourth Circuit. And of course, we can look to other circuits on plain error. And in that case, the evidence was they actually looked at a New York certificate of incarceration to figure out how long he had been incarcerated. And the error was harmless. But there was a plain error under Apprendi and Erlinger. Now, how about the other error, the failure to update the information? I don't see how that's prejudicial or the failure to colloquium about the information. How in the world is that going to satisfy prong three? Well, we're not I'm not pressing the notice in this case. But in terms of 851B, it definitely satisfies prong three. If you look at cases like Espinal and Rodriguez. So in Espinal, there's no 851B enhancement. There's a Massachusetts prior under an alias. The records are weak. There's a reasonable probability that if he had been given a colloquy, it might not have counted as a prior. The same thing in Rodriguez. The defendant denied his prior. There wasn't a proper 851B colloquy. It wasn't harmless because it wasn't clear if there had been the proper procedure, it triggers a beyond a reasonable doubt standard at a later step of 851. And it wasn't clear that the district court had used that. Here, I think we're even stronger that if there had been a colloquy and beyond a reasonable doubt requirement, this doesn't count. It's not a prior. But at the very least, as a dropback position, there's a reasonable probability of reasonable doubt whether this counted as a serious drug felony for all the reasons that I've stated. We don't need to prove that it's knocked out. I think we can prove that it's knocked out at like kind of a motion for judgment of acquittal type level. But we don't have to. We just have to show there's a reasonable probability of reasonable doubt that this was a prior and it's not. One more quick question on the term of imprisonment. He was serving pretrial detention for part of that. Right. On another case, on another case, it was pretrial detention. Right. Is it your argument that pretrial detention time served in pretrial detention can't be counted as term of imprisonment? I mean, it's kind of a semantics issue. If pretrial detention is what happened here, then no. But if it's pretrial detention on this case after you've been arrested and it's not double counted, like in the federal time credit statute, then maybe it could count there. Or, you know, one could make a more aggressive position that it shouldn't count. We don't need to make that argument here because this isn't actually pretrial detention on this case. So the problem, as you see it, isn't that it was time served in pretrial detention. It's because it was time served in pretrial detention on a different crime. And then it was already credited to the other time. That time was gone by the time he got to sentencing in 2011. Thank you. All right. You've saved time for rebuttal. Let's hear from Mr. Hallowell. Good morning, Your Honors, and may it please the Court. Adam Hallowell for the United States. I'd like to spend some time addressing both the sufficiency argument and the serious drug felony issue later in the argument. But I'll start with the McFadden issue and the drug analogs. Can I trouble you to start with the gun issue? Not at all, Your Honor. I'm having a lot of trouble seeing how a gun in an abandoned house adjacent to Mr. Guyton's house, without anything else, shows that he exercised dominion and control over the guns. Absolutely. There are three overarching reasons why a reasonable jury could have concluded, beyond a reasonable doubt, that he possessed those guns. First, timing. In the days leading up to August 9th, Guyton knew that the police were closing in and he was moving contraband, moving his drug operations from house to house, concealing other contraband. Wait, wait. OK, hold on. From house to house, there's evidence in the record. I mean, we know there are other guns where I believe Ms. Horne has conceded under Dorsey. They can only preserve that for future argument. But the guns that were found in the trash in front of his house. Yes. So he has a history of putting his guns in the trash. Is there any evidence? Where's the evidence that he was putting it in houses? Let alone this house. Let alone this house. So just starting, you know, moving ahead to his other conduct and the concealing of other contraband, you referred to the drugs that are placed in the trash bin in front of him. That is picked up the day before these guns are found in the house. That's a chronological link. That's also evidence that he is concealing those guns, evidence of his crime, tools of the trade. There's also evidence in the timing about him moving his drug mixing operation around this neighborhood in the west end of Pittsburgh. He first, on August 6th, moves the drug operation to Mr. Defy's house, stays there for a couple of days. And, you know, again, this is three days before the search on August 9th. Then after a day or two at Defy's house, he picks up and moves again elsewhere in the neighborhood to Anthony Lozito's house. So he is clearly aware that the police are on to him at this point. Is there anything tying him to this house, the abandoned house next door with an open door that anyone can go into? It's an open door that anyone can go into, but it is extremely accessible, very proximate to his house. Your argument appears to have no limiting principle such that he has constructed possession of everything in the neighborhood, then? Not at all. Not at all. It ties together the specific facts of the timing of his drug activities, his efforts to conceal other contraband, and the sheer accessibility of this. You have timing, but you've got a neighborhood. Weren't there a dozen drug dealers involved in this case? It could have been any of them stashing drugs in that house. So there's no evidence about other drug traffickers unrelated to Guyton who are operating in this neighborhood. That's pure speculation at this point. And again— How many drug dealers were involved in this particular prosecution? There were five others charged at this docket number, Mr. Defy also. But the evidence shows— And didn't the trial attorney tell the jury that she was going to link Guyton to the guns in the abandoned home through a testimony of a witness? And that testimony never happened. She said that Defy would testify that Guyton once talked about using the abandoned house as a mixed operation. Right. And what did Defy say? Defy said that he and Guyton had never spoken about that house. But that's— That's the inverse of what she promised the jury was going to hear. I think it's a very minimal promise for the AUSA to have made to the jury because these are two houses that are very close together in the west end of Pittsburgh. They're, you know, consecutive houses. It might be a minimal promise or an important promise, but either way it was a promise not kept. Well, opening statements are not evidence. True. And this—we're looking—we're not relying on that. But what else did you have? What else did she have? What else did the prosecutor have? We had the whole sweep of his drug activity, his actions in the days leading up to this seizure, evidence to trying to conceal the other guns, trying to conceal the drug operation. We also have— All right. Even if you're right, that as a matter of common sense, the jurors could say, I'm confident beyond a reasonable doubt that Guyton stashed his guns in the adjacent house. Even if that's true, how do you get around our precedents? How do you get around Brown? How do you get around Jenkins? Well, I want to take us back— Did you need us to go on bank and overturn those? I don't think that we do. I want to take us back to the broader— First of all, cases like Foster have said that even if mere proximity is not enough, then evasive conduct, motive, other evidence in addition to proximity is sufficient circumstantial evidence to prove possession of contraband item. And that is what we have here. We have his evasive conduct in concealed evidence. Do you want us to say proximity includes an adjacent building? Yes. Yes, Your Honor. Even though in Jenkins, he's on the couch, and the drugs and the gun are on the table in front of him, and Brown lives in the house. In those two cases, we don't have the prior history of those two defendants trying to conceal other contraband, being at the center of this drug conspiracy. And I want to just go through the specifics of each of these categories. Isn't there something to the fact that he had a prior conviction, and he had a prior conviction that he likely knew could put him in further jeopardy if he possessed firearms? That's absolutely true. Doesn't that factor in to the equation here, whether or not this possession was constructive? It does, absolutely. He is a person, unlike others, you know, speculatively in the neighborhood, who has a motive to conceal contraband because of his felon status, because he knows he is a large-scale fentanyl analog operator importing large quantities of this from China, because he's been arrested with drugs in the previous three weeks twice, and because of also the William Lewis episode, which I do think the court should focus on as showing the specific timing of this. Guyton's arrested outside Lewis's house on Dunsite Street on August 2nd. On August 5th, there's a state search warrant executed at Lewis's house. He appears to have stamp bags provided by Guyton, and then Guyton tells DeFide, Lozito, and another associate that Will Lewis's house got raided. That happens after August 5th and before the August 9th raid. That shows that in a space of a couple days, Guyton is taking evasive action. This is the evasive action described in Foster, Judge Hardiman, that can be, in addition to mere proximity, for a reasonable jury to conclude that there is constructive possession here. And, you know, then moving on to parallels between these guns and Guyton's other actions in the drug conspiracy. Guyton possessed the other guns. You know, we know he uses guns in the, you know, during his drug activities. He shows the other trash guns to James DeFede. The guns in the trash were a handgun and a long gun, the same pair of weapons that are found in the house. You know, that's an indication, perhaps, of what types of guns he likes. You know, he stores guns temporarily at Anthony Lozito's shed, DeFide testified. DeFide testified also that Guyton had drugs in a duffel bag when he was mixing drugs at DeFide's house. These guns are found in the house in a duffel bag, similar packaging. And remember that Guyton kept mixing drugs up until August 9th, even after getting rid of the other guns. And he also kept a ballistic vest that was found in his house by Trooper Rita during the search. That indicates that even if he's gotten rid of the guns in the trash, which would link to him, he's still planning on putting himself in dangerous positions. And last, just based on the proximity of this house to Mr. Guyton's house. They're not in his house, but they are right next door. This is a closely built neighborhood in Pittsburgh's West End. You know, it's described as a neighborhood of townhouses, a single-family house. He can get around it on a hoverboard. This house has a back door that's wide open. Trooper Rita testified that he was immediately concerned it could be someplace that Guyton was hiding during the search or might pose a threat to law enforcement. It's easy for Guyton to get in next door. And if you look at Google Maps, which the appellant cites in their brief. You make a compelling argument that he had motive, he had opportunity, he had history, he had all kinds of things, but there just doesn't seem to be evidence that he actually went in there and exercised dominion and control over them. There's no direct evidence, but there is circumstantial evidence. In this court's case, even after Brown. There's no direct evidence that he physically possessed them, but where's the evidence that he ever exercised dominion and control over those guns? The fact that the guns are in this house that are right next to him at a time when he is getting rid of other contraband. That showed that he had the ability to exercise dominion and control. Is that enough? That's enough for some reasonable jury, a reasonable jury, to conclude that he was the person who put them there. Any other explanation for how those guns got to this house would be too great of a coincidence. And remember, the Brown and Jenkins don't undermine the broader standard for sufficiency of the evidence that this court explained in Caraballo-Rodriguez. This court can't sit as a 13th juror. It can't usurp the function of the jury. It has to give substantial deference to the jury's verdict. It heard the evidence, heard the testimony, made credibility determinations, even if other inferences. It sounds like you're arguing Caraballo-Rodriguez implicitly repealed or abrogated or undermined Jenkins and Brown. I think to the extent that Jenkins and Brown created a heightened standard for constructive possession, then that would be true, that there's a conflict between those two cases. Right, but we'd have to go unbanked. I don't think that's true because even under – I'd point the court to Judge Porter's concurrence and win, Your Honor, to say that Brown and Jenkins can be cabined to the unobjectionable proposition that proximity alone does not always establish constructive possession, but it can in light of all the other facts of the case, which we have here, the timing, the guidance, other actions, and the fact of the vacant house itself, which would have been a very unreasonable place for anyone else to store contraband for a long period of time. It had been broken into. Just remind us, the jury did find Brown and Jenkins guilty, right, and then our court overturned those convictions. They did, they did, certainly. Okay. Could we go on to the McFadden instruction? Absolutely, Your Honor. Yeah, in this instance, there's no error under McFadden. There's certainly no plain error, and the other two prongs of plain error review are not met. We heard your friend, Ms. Horne, argued very ably and forcefully, the problem here that, you know, this case, the defense, was about, you know, an unusual substance, that it was maybe controlled under state law. So how is the instruction clear? She really was emphasizing prong one. How was prong one clear enough that it didn't, you know, allow the jury to convict on a mistaken understanding of the law? Right. I think clarity goes to prong two, and we can go there in a moment. Prong one is just, does the jury instruction state the correct legal standard, and anything beyond that is abusive discretionary review for the precise phrasing of a jury instruction. And this does state the correct legal standard. The instructions ask the jury to, you know, require the jury to find that Guyton knew either the legal status of the substance or its chemical structure and physiological effects at page 597. That's what McFadden requires. That's what McFadden requires in summarizing the requirements on each of those points, legal status and chemical structure and physiological effects that the court had just previously moments earlier said at page 596 of the instructions. That shows, you know, remember the substantive requirements, Guyton also had to have had knowledge of those requirements. That is a correct phrasing of the law. In fact, it's the exact phrasing that the Fourth Circuit used on remand in McFadden to describe what the Supreme Court had said. So that was not an error at all. You know, again, if you are looking at the phrasing of the instructions, there's no abuse of discretion to the court in simply referring to what it had said minutes earlier, seconds earlier to the jury. And in any event, there's no plain error here. The second prong is not satisfied. This court said in Dozier, the unpublished case, that an error of clarity by definition can't be a plain error in a jury instruction. And I'd submit that that's a proper application of Alano. So we certainly argue no error under McFadden and no plain error at prong two. But where in the jury instructions did the judge charge that Guyton had to know he was violating federal law? Isn't that what McFadden requires? I'd say that the legal status refers to that. And I'd say also that the fact that— Wait, the legal status. Yes. Legal status generically? Legal status as a controlled substance analog, which is a term of federal law. But it could be a controlled— So that word analog is doing a lot of work. You're saying the word analog there takes it out of any sort of consideration that it's a violation of state law? I'd say it refers back to the federal definition of controlled substance analog, which the court had just given at 596. But even if you don't look solely at those two pages, you can also look to, as was discussed, the court refers to all of the federal statutes that Guyton is charged with violating. This is a federal drug offense. Possession of a drug analog is a federal offense. That's clear enough from the instructions. The court never refers to status under state law, never tells the jury that it can convict under any law. They try to manufacture that as something that the court said, but it's not in the jury instructions. What about the second McFadden theory? Yes, exactly. And that's also properly referred to here. Again, the court's reference in the knowledge instructions to the chemical structure and the physiological effects, that properly refers to the requirements that are given on 596, that the chemical structure and the physiological effects have to be substantially similar to a listed controlled substance. That's also, again, a reiteration of the McFadden standard. It's what the Fourth Circuit used to summarize the standard. That's not an error at prong one. It's not a plain error at prong two. I'm happy to move on to prongs three and four on the McFadden issue and just explain the evidence that we have here in the record that shows that this is not, at both prongs of McFadden, either option that show that this did not affect his substantial rights, even if there were a plain error. And this applies also to prong four of plain error. So as to his knowledge of the legal substance, the clear evidence there is he knows that these subjects are, these drugs are subject to seizure at customs. And that is exactly what the Supreme Court said in footnote one of McFadden, is evidence of knowledge that is a federally controlled substance subject to seizure at customs. He says in his Skype messages with the Chinese. But customs have seized them if they were only violative of state law? I'm not sure of the answer to that, Your Honor. But if that were the case, the Supreme Court would not have said what it said in McFadden, that seizure by customs is evidence of knowledge, knowledge that they're subject to seizure by customs can show evidence of a violation of federal law. And again, the Skype messages are very clear. He's asking the Chinese suppliers to camouflage them to avoid customs. He says customs has been strict. You know, and he says, you know, especially after count seven, which is the first the first arrest, the first intercepted package, he knows that federal law enforcement is invested. He's he's interviewed by a homeland security agent and I believe also postal inspector. So that shows it's not just use of the mail that's involved here. It's federal interest, federal law enforcement in interdicting drugs. And again, this goes right back to textbook of what the Supreme Court says. And one of McFadden that shows knowledge that he is dealing with a federally controlled substance, which, again, I'd remind the court, it's not either or. It's not exclusive that if he thinks this is violative of state law, he means that means it's not violative of federal law. He can believe it's violative of both federal and state law. And that's clearly what's you know, what should have been in his mind once he's interviewed by federal agents and then charged. Is there any testimony or evidence that he thought it was violative of only state law or is there just argument to that? No, I mean, there was not even argument to that effect in district court. And again, another reason why there's just argument now is just there's just argument now. He he did not contest in his closing any counts of the firearm counts, which should be a reason why these arguments on plain air shouldn't be upheld. And again, on prong to they concede his knowledge of the physiological effects. And he also has knowledge that these are substantially similar chemical structure to fentanyl, because he's asking the Chinese suppliers for fentanyl type products for opioids. I'd point you to the Skype messages at pages 11 to 14 of the supplemental appendix and just the entire sweep of these Skype conversations. You know, the Chinese suppliers are promising him very strong product of opioids, something that's similar to morphine. So he knows that these are not just powerful drugs that are as powerful as fentanyl. He knows they operate because of their similarities as drugs to fentanyl. That's enough on prong three for sufficient evidence. We submit that it prongs three and four as on all the plain air prongs. The drug analog counts. Can you talk about the 2009 state conviction and its significance in this case? Absolutely. Absolutely. I think their argument has kind of shifted from their opening brief when they seem to be arguing that pretrial detention as a whole could never be counted towards the term of imprisonment. They've abandoned that argument now. They're just focusing on the specifics of this 2009 conviction and that conviction. 2011 conviction. It's a 2009 crime. 2009 crime, 2011 conviction. The sentencing order in 2011 clearly says that these 256 days, eight months of pretrial detention time previously served in 08 are counted towards his term of imprisonment for the effects. That is the requirement of the definition of serious drug felony, and that's the sole standard that's set. And that sentencing order, which is a trial exhibit, it does go back to the jury. It conclusively shows that for that 2011 conviction, those eight months are counted towards his term of imprisonment. So it's clear the definition of serious drug felony. There's no argument, I think, that concurrent sentences don't count. The Fourth Circuit addressed this a couple years ago in a case called Skaggs, that you can have a serious drug felony and serve more than 12 months even if you are serving that same time concurrently for another offense that doesn't qualify. So the fact that it's credited to both the 2008 heroin offense and the 2009 heroin offense, that's not itself a problem. So the sentence imposed was 18 to 36 months. Correct. How much time did he actually serve? I mean, this was not in the trial record, but it's in what they have. I believe he served about 15 months, and that's at the prison records that they submitted from Appendix 746, and they've just submitted those for the first time on appeal. And it's clear that some portion of that was attributable to the prior crime that he was serving pretrial. Yes. And then was later given credit for. Yeah. The 08 offense, he commits that crime in 08. He's sentenced in December of 2009. And this, again, is not in the trial record, but it's in the PSR. In 2009, for that first conviction, he's given credit for the pretrial detention time in 08. And then in the second conviction, the qualifying offense that we're talking about where he's sentenced in 11, he's also given credit for that same period of time. How much time is he given credit for? He's given credit for 256 days, about eight months, and that is April 9th of 09 to December 20th of 09. And, again, that's the order of sentence at page 656. And, again, that's in the record. It's a very clear document. So you said he served 15 months. He served about 15 months as shown by the prison record. He's given credit for eight months of prior time. The prison sentence on this qualifying offense is 18 to 36 months in state prison. He's eligible for this recidivism risk reduction incentive, which they, again, citing to appellate documents from that, say goes back to 13 and a half months. But the point is these eight months are counted as the term of imprisonment that he served for this offense under the serious drug felony. They're credited to the 2011 conviction even though they were technically served under the prior case. That's correct. Their only argument is that that crediting in the 2011 sentencing order somehow. Vitiates time served. Somehow it can't be counted as time served because it's inconsistent with state law perhaps or because it's inconsistent with how it would be treated in federal law. That's not a question that's asked by the definition of serious drug felony. So if we conclude, I said if we conclude, that he didn't serve, he was not in prison for 12 months on that 2011 conviction, what does that do to the sentences imposed in this case? Yeah, I think you'd have to ask at the procedural steps. You'd have to ask on the procedural errors what would happen. Starting at the Apprendi issue, we have not contested Judge Bibas' prong two of Apprendi, the plainness of the error. It's certainly a step beyond Almendrez-Torres, but we haven't argued that any Apprendi error here would not be plain. At step three, I guess I'd point out that the only evidence in the record that went back to the jury was this document, the order of sentence, which indicates he's sentenced to 18 to 36 months, and it says that the credit for time served is eight months. And so to that extent, things outside the record that they're bringing in now, prison records, the other convictions, that might not be enough to show an effect on his substantial rights under Apprendi, given that this document clearly saying that the time served counts is in the record. But again, I guess I'd point the court to the fact that this sentence, the sentencing order, does say these eight months are credited to that 2011 conviction, the offense he committed in 2009. For them to kind of undermine at this point what that sentencing court held, which was not appealed by the Commonwealth, it's not appealed by Guyton, no one contested that those eight months should count for his conviction and sentence in 2011, even if that maybe shouldn't have happened under state law. That's the final word of the Pennsylvania state courts, that these eight months count towards that sentence. It counts towards his term of imprisonment. That's a historical fact, even going beyond other principles, full faith and credit, collateral estoppel, comedy between state and federal courts, why this court should not try to second guess. I'm not sure that you answered my question. I said if we disagree with you on that, if we disagree with you on the counting, what does it do to the sentences imposed here? Yeah, so if this court disagrees on all four prongs at Apprendi, then there would need to be resentencing without the 851 enhancement on the drug counts. And that will apply to the 320-month sentences and to the 120-month sentences, will it not? I mean, I suppose that for the sentences that were at the stat max of 10 years, those would not need to be vacated. It would really only be the drug counts that would need to be vacated, because there's no indication that sentences below 15 years or at 10 years on the other counts would need to be, were affected by the sentencing enhancement. I mean, it takes, for the B1A, it takes it from 10 to 15 years. Can we conclude all that? Do we need to send it back to the district court for them to resentence? I think this court can conclude that, I mean, just based on Judge Strachan's statements at sentencing, this was an extremely serious offense. You know, the fact of the high volume of drug trafficking, Guyton's consistent criminal activity, I think there's enough in the sentencing transcript to show that these other sentences would not have been affected by the 360-month enhancement. I mean, the 30 years that we have here are far above the mandatory minimums that we're talking about for the 851 enhancement. But again, my primary argument, at least as to the Apprendi arguments, on the procedural points we agree, there's no prejudice from the lack of a colloquy or the phrasing of the information. But the state sentencing order clearly says as a historical fact, these eight months were counted towards this term of imprisonment for the 09 offense. That's enough for this court to affirm the sentencing enhancement. Can we go to counts eight and nine? Yes, Your Honor. The district court made a mistake. It charged Guyton with domestic rather than international money laundering, correct? The instructions borrow some language from A1, even though they correctly said that he's actually charged with A2, and they correctly required the jury to find that under A2 he caused a wire transfer to China. It's still, the instructions still refer to A2, even though they are borrowing language from A1. So that's a reason I think it's not a constructive amendment at all. Borrowing language from A1? I mean, that sounds like a euphemism for they charged an A1 case when it was an A2 case. Yes, but you're not changing what you are asking the jury to find. The fact that the cause of the wire transfer to China language is in there shows that you are still asking the jury to convict of the same conduct that he's charged with. I mean, compare this to cases like Sterone. Well, doesn't that just show that it, that sounds like a prong three argument, that it didn't affect his substantial rights because everybody knew it was China. He knew he was dealing with China. He was talking to people in China. He was concerned about importing the drugs from China. I think cases like Fallon show that evidence in the case, you know, the details of the jury instruction can show that there's not a constructive amendment at all, you know, and also that there was no violation of prong three. So, I mean, again, compare this to Sterone and McKee where the indictment charges a Hobbs Act extortion dealing with sand and, you know, the instructions at trial refer to steel, and that's what the evidence is all going to at trial. Both sand and steel. Similarly, in McKee, you know, false tax returns versus falsifying records. Here, all of the evidence goes towards the A2 international money laundering. The verdict form correctly says A2 money laundering. The jury doesn't ask about that. We argue that's not a constructive amendment. That's not a plain constructive amendment, but overall, even then, there's no argument at prong three that he clearly did make completed wire transfers to China. That's shown by both the MoneyGram records and by Agent Tetrault's testimony about those records. I mean, at appendix 192 to 194, she testifies these records show these transfers are sent to China. So if the MoneyGram transaction documents are not enough, we argue her testimony completes the circle there. But the MoneyGram records clearly show those records are not ambiguous. They're received in China. If there are no further questions. Thank you, Mr. Hallowell. We'll hear rebuttal from Ms. Horne. Thank you. If I could please begin with the sentencing issue and just correct some misstatements from my friend on the other side. First off, where we agree, the government doesn't dispute that the 851 enhancement is about time actually served, not the sentences pronounced. And they don't dispute that they need these 256 days that were credited by the district court. I'd also point out that this is in the trial record. That's government exhibits 56 and 57, that it had been previously credited to another case. And in addition, they fault us for citing to the PSR, which we don't need because it's in the trial record. But Greer tells us to do that, where there's an omission from the jury instructions. It says, come in on appeal and tell us why you have a plausible case that this shouldn't have applied. And we do have a plausible case that it's not a serious drug felony. So we're doing exactly what the Supreme Court says in Greer. We're also not trying to undermine anything about the state court order. We accept that as a historical fact. The question is, does it equal the federal definition? Our argument is that it doesn't. And this is about the meaning of the federal text. To Judge Fisher's question, the government has stood up today and conceded that if their 851 enhancement was applied in error, the remedy is resentencing. It would. And they conceded the drug counts would need to be resentenced. All the counts would need to be resentenced because it would affect the total calculus. If I could, very briefly on the McFadden issue, the government gets up and says about the federal interview. It was very short. It didn't refer to drug schedules. And also right after that, Mr. Guyton was taken to the Allegheny County Jail. If I could talk a little bit about the construction of amendment, I think really the issue comes down to prong three or prejudice. There was very little attention devoted to these counts of trial. The government didn't even bother to call a MoneyGram witness. There was no evidence about MoneyGram. The spreadsheet was barely explained. And what Agent Tetrault said was that it was sent. And this actually goes to the wrong charge because the wrong charge is about sending. She said nothing about whether it was received in China. These people in China are strangers engaged in criminal deals, Lu and Chang. And significantly, they're not linked up to the interdictive package. That package, the text messages show, was interaction with someone named Yolanda03112. And so the fact that they claim that this money was received in China really only involves cells of a spreadsheet that were never testified to or explained to the jury. And remember, when we're talking about prong three on a constructive amendment, it's a different kind of prong three. There's a presumption of prejudice that the government has to overturn. And here they're attempting to overturn it based on an exhibit that was never explained to the jury. The jury had no reason to trust MoneyGram, had no reason to look to these cells to try to interpret them. Because they were charged on the wrong offense. Can you address what Mr. Hallowell said about whether there was any argument in the district court, evidence or argument in the district court, that Guyton thought he was violating state law but not federal law? Sure. So I think what this comes down to is that the McFadden era really vitiated this defense. So while all we have in the record is that state law, this violated state law. And to your question, Judge Hardiman, the testimony was that this package interdiction happened because it violated Pennsylvania law. So you asked whether Customs could get involved for a Pennsylvania law violation. That's at Appendix 204. They did the interdiction because the Allegheny County Crime Lab was able to confirm that methoxyacetyl fentanyl was on the Pennsylvania schedule. They couldn't confirm cyclopropyl fentanyl for another week because it was brand new and nobody knew what it was. No, but I'm not sure you answered my question.  Mr. Hallowell said that you're making argument in this court that he could have violated state law but not federal law. And I'm asking whether Mr. Hallowell is correct that in the district court, there was neither evidence nor argument. Well, I think there absolutely was cross-examination on this point. Mr. Guyton effectively did this himself. When Agent Tetrault was testifying, schedule one means the Pennsylvania schedule. We said, well, we're in federal court. What about federal law? And Agent Tetrault said, I'm not sure about that. I'm not an attorney. And there was also the same testimony with the Allegheny County medical examiner. So I'll just go back to Greer for a second. Greer says, what you have to do is you can't just say there was no jury instruction. That's the end of the story. You have to say, what if there was a correct jury instruction? What would the trial have looked like? In Greer, there was no Rehaith instruction. They say, well, realistically, if there had been an instruction, well, all these facts would have been argued to the jury. And here we have the same thing to the benefit of Mr. Guyton. If there had been a McFadden instruction, plus this trial record, which is fairly unique, which sets up the distinction between federal and state law, it would have been argued to the jury. He said that the court just told you he has to know it's controlled under the federal drug abuse laws. Everything we heard in this case was about controlled under state law, under state law. That's why they interdicted. Those are the lab reports. Those are the schedules. In terms of the guns in the drug house, I'll just point out the government cited no case today. The only case they cited was one where the defendant was driving with a gun in his own car. So this would be a real departure not only from this circuit's law, but, frankly, from any circuit's law. There simply is no case. You know, there are unfortunately people who have neighbors who let their houses become derelict, who leave the back door open. This happens in cities. Even if I'm a drug dealer, I don't now possess the items in my neighbor's house. Thank you. Thank you very much, Ms. Horn. Thank you, Mr. Halliwell. The court will take the case under advisement.